PAUL B. DERBY [SBN 211352]
pderby@skiermontderby.com
HAJIR ARDEBILI [SBN 224624]
hardebili@skiermontderby.com
JOHN J. O'KANE IV [SBN 268632]
jokane@skiermontderby.com
SKIERMONT DERBY LLP
800 Wilshire Boulevard, Suite 1450
Los Angeles, California 90017
Telephone:   (213) 788-4500
Facsimile:    (213) 788-4545

Attorneys for Plaintiffs
ELJAY TRUST UA 10/25/1993, MARAGNI/ECTON FAMILY
TRUST UA 12/22/2009, YORAM ARBEL AND JACQUELINE A.
ARBEL REVOCABLE TRUST & IRA SERVICES TRUST
COMPANY CFBO YORAM ARBEL, JOSEPH YASGUR, THE
LI/WONG TRUST UA 07/24/2015, MILLENIUM TRUST
COMPANY CUST. FBO HERBERT WOLFRAM IRA,
MILLENIUM TRUST COMPANY CUST. FBO ELIZABETH
HARRIS IRA, PHYLLIS COHEN FAMILY TRUST UA 10/01/1989,
IM3, LLC, MILLENIUM TRUST COMPANY CUST. FBO MICHAEL
T. DALBY IRA, MILLENIUM TRUST COMPANY CUST. FBO
RONALD T. DAVIS IRA, GARY A. ZELLERBACH AND LINDA
ROSENBERG ZELLERBACH 1999 REVOCABLE LIVING TRUST,
NANCY HOYT REVOCABLE TRUST UA 09/07/1995, MILLENIUM
TRUST COMPANY CUST. FBO NANCY HOYT BENEFICIARY IRA,
JORDANA HOYT, MARGOT H. JOHNSON, and MICHAEL PRESTIN

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELJAY TRUST UA 10/25/1993, a Colorado revocable trust; MARAGNI/ECTON FAMILY TRUST UA 12/22/2009, an Arizona revocable trust; YORAM ARBEL AND JACQUELINE A. ARBEL REVOCABLE TRUST & IRA SERVICES TRUST COMPANY CFBO YORAM ARBEL, a California revocable trust; JOSEPH YASGUR, an individual; THE LI/WONG TRUST UA 07/24/2015, a California revocable trust; MILLENIUM TRUST COMPANY CUST. FBO HERBERT WOLFRAM IRA, a California individual retirement account; MILLENIUM TRUST COMPANY CUST. FBO ELIZABETH HARRIS IRA, a Tennessee individual retirement account; PHYLLIS COHEN FAMILY TRUST UA 10/01/1989, a | Case No. _____<br><br>**COMPLAINT FOR**<br><br>1. **VIOLATIONS OF SECURITIES EXCHANGE ACT SECTION 10(b) AND SEC RULE 10b-5**<br>2. **VIOLATIONS OF CALIFORNIA CORPORATIONS CODE SECTION 25400 (CORPORATE SECURITIES FRAUD AND MARKET MANIPULATION)**<br>3. **COMMON LAW FRAUD**<br>4. **COMMON LAW NEGLIGENT MISREPRESENTATIONS**<br>5. **BREACH OF FIDUCIARY DUTY**<br>6. **UNFAIR BUSINESS PRACTICES**<br>7. **PROFESSIONAL NEGLIGENCE** |

1  California revocable trust; IM3, LLC, a
   Colorado LLC; MILLENIUM TRUST
2  COMPANY CUST. FBO MICHAEL T.
   DALBY IRA, a California individual
3  retirement account; MILLENIUM TRUST
   COMPANY CUST. FBO RONALD T.
4  DAVIS IRA, a California individual
   retirement account; GARY A.
5  ZELLERBACH AND LINDA
   ROSENBERG ZELLERBACH 1999
6  REVOCABLE LIVING TRUST, a
   California revocable trust; NANCY
7  HOYT REVOCABLE TRUST UA
   09/07/1995, an Illinois revocable trust;
8  MILLENIUM TRUST COMPANY
   CUST. FBO NANCY HOYT
9  BENEFICIARY IRA, an Illinois
   individual retirement account; JORDANA
10 HOYT, an individual; MARGOT H.
   JOHNSON, an individual; and MICHAEL
11 PRESTIN, an individual.

12              Plaintiffs,

13 v.

14 BLC SECURED CREDIT PARTNERS II
   LP, a Delaware limited partnership;
15 BRIDGE LANE PARTNERS GP II LLC,
   a Delaware limited liability company;
16 BRIDGE LANE CAPITAL LLC, a
   Delaware limited liability company; MAN
17 GLOBAL PRIVATE MARKETS (USA),
   INC., a Delaware corporation; MAN
18 GROUP PLC, a United Kingdom public
   limited company; and DOES 1 through 25.

19             Defendants.

**DEMAND FOR JURY TRIAL**

COMPLAINT FOR DAMAGES

**INTRODUCTION AND SUMMARY OF CLAIMS**

1.      Plaintiffs share two traits in common:  Each invested in BLC Private Credit Opportunities Fund II, LP (the "BLC II Fund"), and each did so based upon false investment advice provided by Defendants.  In total, Plaintiffs invested millions of dollars into the BLC II Fund.  Most of that money has been lost as a result of Defendants' fraudulent advice and negligent decision-making.  More specifically, Defendants represented that the BLC II Fund would include tens of millions of dollars of investments, and that the BLC II Fund would invest in a low-risk, diverse manner. None of that was true.  Instead, the BLC II Fund included only about $8 million (or as low as $5 million) in investments, heavily concentrated in a single loan to a non-operational sawmill.  That investment, which plainly violated Defendants' own guidelines and policies, appears to have been made in order to save the sizable investment made in the same sawmill by other investors on the advice of Defendants, in plain breach of Defendants' fiduciary duties to Plaintiffs.  Defendants continued to throw more money into the sawmill, with the BLC II Fund eventually investing 73% of its money into attempting to bring the sawmill back on line, and continued to deceive Plaintiffs about the status, potential, and profitability of the same.  Defendants also made themselves responsible for managing the operations of the sawmill, despite having no meaningful experience doing so, and were grossly negligent as operators. Plaintiffs have lost almost all of their money because Defendants decided to bet the fund on an inexplicable, high-risk loan, one that should never have been made given Defendants' promises about the quantity and type of investments to be made on Plaintiffs' behalf, and one that should never have failed given Defendants' misrepresentations about the strength and success of the investment.

**JURISDICTION AND VENUE**

2.      This Court has subject-matter jurisdiction here pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims against Defendants are brought under and involve questions of federal law.  (Notably, diversity jurisdiction also exists here, as there is complete

1  diversity among the parties and the amount in controversy in this matter well exceeds
2  $75,000.00.)

3       3.      This Court has personal jurisdiction over Defendants because, without
4  limitation and as described below, Defendants intentionally reached into California to
5  contact Blue Hall Capital, LLC ("Blue Hall"), an investment advisory firm
6  headquartered in Napa, California, and induced Blue Hall, as the representative and
7  agent of Plaintiffs, to recommend and cause investments by each of the Plaintiffs in
8  the BLC II Fund.  Moreover, on information and belief, Defendants have conducted
9  and continue to regularly conduct business in the State of California, including within
10 the Northern District.  Fed. R. Civ. P. 4; Cal. Civ. Proc. Code § 410.10.

11      4.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2)
12 because the acts of Defendants giving rise to Plaintiffs' claims occurred in, and thus
13 liability arose in, the Northern District of California.

14                              **THE PARTIES**

15      5.      Plaintiff ELJAY Trust UA 10/25/1993 ("ELJAY Trust") is a Colorado
16 revocable trust, whose trustee Lynn D. Janklow resides in Gypsum, Colorado.
17 ELJAY Trust invested a total amount of $150,000.00 in BLC Secured Credit Partners
18 LP based upon Defendants' representations, as conveyed to ELJAY Trust's financial
19 advisor Blue Hall Capital LLC.

20      6.      Plaintiff Maragni/Ecton Family Trust UA 12/22/2009 ("Maragni/Ecton
21 Trust") is an Arizona revocable trust, whose trustees Donna R. Ecton and Victor H.
22 Maragni reside in Paradise Valley, Arizona.  Maragni/Ecton Trust invested a total
23 amount of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants'
24 representations, as conveyed to Maragni/Ecton Trust's financial advisor Blue Hall
25 Capital LLC.

26      7.      Plaintiff Yoram Arbel and Jacqueline A. Arbel Revocable Trust & IRA
27 Services Trust Company CFBO Yoram Arbel ("Arbel Trust") is a California
28 revocable trust, whose trustees Yoram Arbel and Jacqueline A. Arbel reside in

Sunnyvale, California.  Arbel Trust invested a total amount of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to Arbel Trust's financial advisor Blue Hall Capital LLC.

8.      Plaintiff Joseph Yasgur ("Mr. Yasgur") is an individual residing in Mamaroneck, New York.  Mr. Yasgur invested a total amount of $500,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to Mr. Yasgur's financial advisor Blue Hall Capital LLC.

9.      Plaintiff The Li/Wong Trust UA 07/24/2015 ("Li/Wong Trust") is a California revocable trust, whose trustees Nora Jiao Li and Lance Ling Sang Wong reside in San Mateo, California.  The Li/Wong Trust invested a total of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Li/Wong Trust's financial advisor Blue Hall Capital LLC.

10.     Plaintiff Millennium Trust Company Cust. fbo Herbert Wolfram IRA ("Herbert Wolfram IRA") is a California individual retirement account, with Millennium Trust Company, LLC serving as the custodian.  Herbert Wolfram IRA invested a total of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Herbert Wolfram IRA's financial advisor Blue Hall Capital LLC.

11.     Plaintiff Millennium Trust Company Cust. fbo Elizabeth Harris IRA ("Elizabeth Harris IRA") is a Tennessee individual retirement account, with Millennium Trust Company, LLC serving as the custodian.  Elizabeth Harris IRA invested a total of $75,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Elizabeth Harris IRA's financial advisor Blue Hall Capital LLC.

12.     Plaintiff Phyllis Cohen Family Trust UA 10/01/1989 ("Phyllis Cohen Family Trust") is a California revocable trust, whose trustee Robert M. Hoyt resides in Chicago, Illinois.  The Phyllis Cohen Family Trust invested a total of $250,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as

conveyed to the Phyllis Cohen Family Trust's financial advisor Blue Hall Capital LLC.

13.     Plaintiff IM3, LLC ("IM3") is a Colorado corporation owned by Michael Murphy of Malibu, California.  IM3 invested a total of $250,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to IM3's financial advisor Blue Hall Capital LLC.

14.     Plaintiff Millennium Trust Company Cust. fbo Michael T. Dalby IRA ("Michael Dalby IRA") is a California individual retirement account, with Millennium Trust Company, LLC serving as the custodian.  Michael Dalby IRA invested a total of $150,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Michael Dalby IRA's financial advisor Blue Hall Capital LLC.

15.     Plaintiff Millennium Trust Company Cust. fbo Ronald T. Davis IRA ("Ronald Davis IRA") is a California individual retirement account, with Millennium Trust Company, LLC serving as the custodian.  Ronald Davis IRA invested a total of $400,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Ronald Davis IRA's financial advisor Blue Hall Capital LLC.

16.     Plaintiff Gary A. Zellerbach and Linda Rosenberg Zellerbach 1999 Revocable Living Trust ("Zellerbach Trust") is a California revocable trust, whose trustees Gary A. Zellerbach and Linda Rosenberg Zellerbach reside in San Francisco, California.  The Zellerbach Trust invested a total of $150,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Zellerbach Trust's financial advisor Blue Hall Capital LLC.

17.     Plaintiff Nancy Hoyt Revocable Trust UA 09/07/1995 ("Nancy Hoyt Trust") is an Illinois revocable trust, whose trustee Nancy W. Hoyt resides in Chicago, Illinois.  The Nancy Hoyt Trust invested a total of $400,000.00 in BLC Secured Credit

COMPLAINT FOR DAMAGES

Partners LP based upon Defendants' representations, as conveyed to the Nancy Hoyt Trust's financial advisor Blue Hall Capital LLC.

18.     Plaintiff Millennium Trust Company Cust. fbo Nancy Hoyt Beneficiary IRA ("Nancy Hoyt IRA") is an Illinois individual retirement account, with Millennium Trust Company, LLC serving as the custodian.  Nancy Hoyt IRA invested a total of $200,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to the Nancy Hoyt IRA's financial advisor Blue Hall Capital LLC.

19.     Plaintiff Jordana Hoyt ("Ms. Hoyt") is an individual residing in Seattle, Washington.  Ms. Hoyt invested a total amount of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to Ms. Hoyt's financial advisor Blue Hall Capital LLC.

20.     Plaintiff Margot H. Johnson ("Ms. Johnson") is an individual residing in Seattle, Washington.  Ms. Johnson invested a total amount of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to Ms. Johnson's financial advisor Blue Hall Capital LLC.

21.     Plaintiff Michael Prestin ("Mr. Prestin") is an individual residing in Sunnyvale, California.  Mr. Prestin invested a total amount of $100,000.00 in BLC Secured Credit Partners LP based upon Defendants' representations, as conveyed to Mr. Prestin's financial advisor Blue Hall Capital LLC.  (ELJAY Trust, Maragni/Ecton Trust, Arbel Trust, Mr. Yasgur, Li/Wong Trust, Herbert Wolfram IRA, Elizabeth Harris IRA, Phyllis Cohen Family Trust, IM3, Michael Dalby IRA, Ronald Davis IRA, Zellerbach Trust, Nancy Hoyt Trust, Nancy Hoyt IRA, Ms. Hoyt, Ms. Johnson, and Mr. Prestin are collectively referred to herein as "Plaintiffs.")

22.     Third-party Blue Hall Capital, LLC ("Blue Hall Capital") in an investment advisory firm officed at 1370 Transcas Street #753, Napa, California. Blue Hall Capital served as the advisor and agent for each of the Plaintiffs in connection with each of the investments by Plaintiffs in the BLC II Fund described

5

herein, basing such investment recommendations on the information and promises received from Defendants.

23. Defendant BLC Secured Credit Partners II LP ("BLC Secured Credit") is a Delaware limited partnership.

24. Defendant Bridge Lane Partners GP II LLC ("BLC GP II LLC") is a Delaware limited liability company. It was formerly officed at 1 Marshall Street, Suite 207, Norwalk, Connecticut, and was the General Partner of BLC Secured Credit, the fund in which each of the Plaintiffs invested.

25. Defendant Bridge Lane Capital LLC ("BLC") is a Delaware limited liability company. It was formerly officed at 1 Marshall Street, Suite 207, Norwalk, Connecticut, and was the Investment Manager for BLC Secured Credit, the fund in which each of the Plaintiffs invested.

26. Defendant Man Global Private Markets (USA) Inc. ("Man GPM"), as reflected on its website, was launched by Man Group in 2017. It is one of the investment management businesses owned by defendant Man Group LLC, and has approximately $2.2 billion of funds under its management. It is headquartered at Morrison Boulevard 6836, Suite 430, Charlotte, North Carolina, with a registered agent of service of process of Corporate Creations Network, Inc., 615 West Johnson Avenue #202, Chesire, Connecticut 06410.

27. On information and belief, Man GPM is a subsidiary of and/or does business as Man GPM Bridge Lane ("Man Bridge Lane"), which, as reflected on its website, is a private debt specialist that focuses on direct lending to companies. It is headed by Brian Broesder and Westin Lovy, the former heads of defendant BLC, and headquartered at 281 Tresser Boulevard, Suite 1102, Stamford, Connecticut.

28. Defendant Man Group plc ("Man Group"), as reflected on its website, is one of the world's largest investment management firms, with combined funds of $103.5 billion under its management. It is headquartered at Riverbank House, 2 Swan

COMPLAINT FOR DAMAGES

Lane, London, EC4R 3AD, United Kingdom, and traded on the London Stock Exchange (EMG.L).

29.     Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1 through 25, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities, when and if ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those defendants.

30.     Plaintiffs are informed and believe, and on that basis allege, that at all times material to this Complaint, each of the Defendants, whether expressly or fictitiously named, in addition to acting for itself and on its own behalf individually, is and was acting as the agent, servant, employee, partner, joint-venturer, or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants and within the course, scope, and authority of that agency, service, employment, partnership, joint venture, representation, and conspiracy.  Plaintiffs further allege on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants.  Specifically, and without limitation, Plaintiffs allege on information and belief that the actions, failures to act, breaches, conspiracy, and other misconduct alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and done with the cooperation and knowledge of each and all of the Defendants.  Plaintiffs further allege on information and belief that each and all of the Defendants were the alter egos of one another, joint tortfeasors, and successors in interest (including taking the assets and operations of the predecessor, with full knowledge of the predecessor's investments and investors) such that each and all of the Defendants would be liable to Plaintiffs.

///

7

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

31.     On August 14, 2014, Brian Broesder and Westin Lovy emailed Blue Hall member Bob Hoyt to introduce their investment advisory firm, Bridge Lane Capital. Broesder informed Hoyt that Bridge Lane Capital would be creating a fund and targeting at least $100 million of investments.  Broesder forwarded an August 2014 marketing presentation entitled "BLC Private Credit Opportunities Fund I, LP: Direct Investing in the Lower Middle Market" (the "August 2014 Marketing Materials").

32.     The August 2014 Marketing Materials expressly regarded a BLC Private Credit Opportunities Fund I, LP (the "BLC I Fund"), which was in fact, on information and belief, never truly a fund, but instead a group of individuals who elected to invest (or not) in single LLC loans, and mischaracterized to Plaintiffs in order to create the false impression that Defendants were already managing a similar type of fund.  The August 2014 Marketing Materials were presented as reflective of the type of investments that would be made and managed by Defendants in the BLC II Fund, and many material statements in these August 2014 Marketing Materials were expressly or impliedly false, including, but not limited to:  the investments would have "significant downside protection" (page 5); that the fund would focus on "senior securities private debt investments" that had a "predictable return of capital," "high current case yield (15%+)," with "downside protection" like "senior in capital structure" and "strong collateral" (page 6); that all transactions would be "fully secured by senior collateral packages, senior in the capital structure" (page 7); that the investments would be "senior secured / 1st lien" (page 8); that Defendants would engage in "screening diligence" that included liquidation value and various exit strategies (page 10); that the fund had an anticipated close of $100 million in commitments, and the "portfolio will be comprised of 10-20 discrete investments" (page 11); and that Defendants had $50 million of investments committed to close by December 31, 2014, and was targeting another $50 million of investments by March 31, 2015 (page 12).  Defendants also described the type of entities in which

investments would be made as having revenue in excess of $10 million, EBITDA in excess of $2 million, and no more than 5x debt to EBITDA (page 14).

33.    Also on August 14, 2014, Hoyt requested a history of Defendants' loans and transactions.  Broesder responded that Hedge Fund Alerts had received a copy of the August 2014 Marketing Materials, and that Defendants were surprised by the high demand for participation in the fund.  Broesder referred Hoyt to and endorsed a July 23, 2014 Hedge Fund Alert, which describes, all of which was ultimately untrue, that Defendants expected to close on an initial $50 million by September 30, 2014 (just one and a half months later), and a final close by year end of $100 million (just four and one-half months later), and that the BLC II Fund's portfolio would include 10–20 different investments.  In fact, on information and belief, even as late as April 2015, the BLC II Fund had raised no more than about $8 million, and possibly as little as $5 million, much of which money belonged to Plaintiffs.  When Blue Hall raised a concern about this, Lovy responded by email on April 11, 2015, falsely stating that new capital would be coming in "shortly," which statement, on information on belief, Lovy had no basis for making.  It was represented to Blue Hall by Defendants, on multiple occasions, that the BLC II Fund was launched at the request of a large investor in the series of individual loans offered to earlier investors, creating the impression that considerable money had already been pledged to the BLC II Fund.

34.    On August 22, 2014, Broesder informed Blue Hall that Defendants were working on a private placement memorandum and due diligence questionnaire for the BLC II Fund (even though there had never been, on information and belief, a BLC I Fund).  Blue Hall in turn asked for a due diligence date to visit Defendants' Connecticut offices, and on August 23, 2014, returned a signed non-disclosure agreement to Defendants.

35.    On September 12, 2014, Broesder emailed Milton Balbuena (Blue Hall's Chief Investment Officer) a description of various investments that would be typical, "to give [Blue Hall] a better sense of the structures and types of investments we

make." These investments were of the more conservative, asset-based type that Defendants had described in their marketing materials, and that Blue Hall and Plaintiffs therefore reasonably expected to be made in the BLC II Fund.

36. On September 13, 2014, Broesder emailed a Preliminary Investment Summary for Majestic Wood Products, LLC ("Majestic"), a niche sawmill in White City, Oregon. Broesder described the Majestic investment as one that Defendants were "working on right now," with an anticipated close by September 30, 2014, which was months before the January 1, 2015 close on the BLC II Fund in which Plaintiffs ultimately invested, and clearly for the group of individual investors falsely referred to by Broesder and Lovy as the BLC I Fund. The investment summary noted that Majestic had a 6-year average EBITDA of $1.7 million, and 6-year average revenue of $9.3 million, which put it outside of the parameters of any investment that would be made by the BLC II Fund in which Plaintiffs ultimately invested. These numbers were also incredibly misleading given Majestic had not recently performed at this level, something only later known to Plaintiffs. This investment summary also projected 2015 revenues of $10.1 million, and 2015 EBITDA of $3.2 million, which numbers were impossible to justify. The investment summary noted that Majestic's land and buildings had been appraised at only $1.5 million, excluding certain unvalued equipment, also putting it outside of the parameters of any investment that would be made by the BLC II Fund in which Plaintiffs ultimately invested. The BLC II Fund was marketed as an asset-backed lending fund, consistent with the investment policies and guidelines referenced below. On information and belief, Defendants had earlier invested other individuals in a loan to Majestic, and without disclosing any of these earlier investments, invested much of the money raised in the BLC II Fund into Majestic in order to bail out the earlier loan, which was either unfunded or underfunded by the investors who elected to earlier invest in loans offered by Broesder and Lovy and organized as single loan LLCs.

37.     Balbuena visited Defendants on September 16, 2014, to conduct due diligence regarding the potential investment of Plaintiffs' money in the BLC II Fund that was being marketed by Defendants.  Broesder again confirmed that institutional investors would enable the BLC II Fund to be $100 million.  Balbuena brought up Majestic at this meeting, asking why a venture investment like Majestic was being offered to a group of investors that Broesder and Lovy had described as primarily interested in asset-based, senior loans like those that would be made by the BLC II Fund.  Defendants said they had extensive experience in the wood production space, which on information and belief was not true, having had one other loan in this niche, where the end result was a plant fire long before the success of the loan could be evaluated.  In order to provide Blue Hall and Plaintiffs comfort with regard to the type and nature of investments that would be made by the BLC II Fund, Defendants emailed Blue Hall a "Bridge Lane Capital: Internal Controls and Procedures (January 2014)" document.  This Internal Controls and Procedures document contained a number of pledges that were ultimately false and fraudulent:  that all investments would be screened, such that the borrower must generate positive cash flow, have alternative repayment sources, and no reliance on outside borrowers to repay debt obligations (pages 3 and 4); and that in order to protect the investment, Defendants would provide "vigilant oversight," including monthly review of performance and bank accounts (page 9).  Blue Hall was assured in a September 16, 2014 email from Broesder that no investment would be made that did not satisfy Defendants' Internal Controls and Procedures, which Broesder acknowledged was consistent with the content of his conversation with Balbuena earlier the same day.  Blue Hall, and indirectly Plaintiffs, relied on these material representations regarding the policies and procedures that would govern and control investments made in the BLC II Fund.

///

///

38.     On November 12, 2014, Lovy contacted Hoyt to inform him that the private placement memorandum and related documents were completed, and Plaintiffs were now free to make an investment in the BLC II Fund.

39.     On November 25, 2014, Lovy emailed Blue Hall manager Matthew Gropp to explain the closing for the BLC II Fund, and identified two transactions as initial investments:  one for $2.25 million, and another for $8 million.  This did not cause Blue Hall concern because the marketing materials stated a $50 million goal for the initial January 1, 2015 close, and Broesder and Lovy said nothing to revise their prior representation that the BLC II Fund's first round of funding would be in the tens of millions of dollars.  Plaintiffs and Blue Hall therefore understood this November 25, 2014 email as simply updating Blue Hall as to the first loans earmarked for the BLC II Fund in connection with the January 1, 2015 close.  On information and belief, Defendants by this time, starting in late 2014 and continuing into early 2015, were having trouble raising anywhere close to the amount of money represented to Plaintiffs and Blue Hall, and that the expectation of $50 million to $100 million in the BLC II Fund was unrealistic to impossible, none of which was disclosed to Plaintiffs.

40.     Between December 2, 2014, and December 12, 2014, the subscription documents were signed, and the capital call for Plaintiffs' money occurred on December 18, 2014.  The bulk of Plaintiffs' money was invested in the BLC II Fund at this time, with some subsequent money invested after further misrepresentations by Defendants regarding Majestic and the BLC II Fund.

41.     In February 2015, after the January 1, 2015 close of the BLC II Fund and the bulk of Plaintiffs' investments, Blue Hall received a PowerPoint presentation from Defendants entitled "BLC Secured Credit Partners II LP: Direct Investing in the Lower Middle Market (February 2015)."  Like the August 2014 Marketing Materials, this February 2015 PowerPoint suggested 10–20 investments, although the investment period had now been extended to December 31, 2016 (page 13).  Majestic was now listed as a BLC II Fund loan (page 20).  The Majestic loan was described as a senior

COMPLAINT FOR DAMAGES

1  secured debt, which was false as there was debt above this loan, meaning the loan was

2  never senior.  Furthermore, Majestic was more of a distressed venture than the

3  traditional, asset-backed loans presented in the August 2014 Marketing Materials for

4  the BLC I Fund, or during the September 2014 due diligence process.  The description

5  of the Majestic loan was also deceptive, and a further perpetration of Defendants'

6  fraud.  Defendants invested an additional roughly $3.5 million into Majestic, thereby

7  making clear that Defendants had directed earlier investments into the Majestic

8  sawmill, and creating a conflict of interest for Defendants and constituting a breach of

9  their fiduciary duties to Plaintiffs, as it appears new money was being used to bail out

10  old money invested based upon Defendants' advice.  Further, an expectation of 12%

11  interest (paid monthly) was unrealistic, absent using new investment money to fund

12  interest payments to prior investors, and the suggestions that the money would be used

13  to "expand operations" and that the "$3.5 million" had been invested to "increase the

14  plant's production capacity" falsely implied that Majestic was operational.  The first

15  quarter 2015 update for BLC II Fund investors is the same, suggesting that Majestic

16  was a healthy company in need of expansion capital to accelerate its operations.  It

17  was never disclosed, until the second half of 2016, that Majestic was a distressed, non-

18  operating plant that had previously failed because its throughput (number of boards

19  that can be produced per hour) was well below the number needed to break even, let

20  alone turn a profit such that the loan could be repaid.

21      42.   In a March 2015 email, after it was first learned that BLC II did not raise

22  the tens of millions of dollars of investments that Defendants had said were already in

23  the pipeline, Lovy again assured Blue Hall that more money was coming into the BLC

24  II Fund "shortly," thereby continuing to assure Plaintiffs that the BLC II fund would

25  ultimately be diversified.  Blue Hall was never told that the total amount invested in

26  the BLC II Fund remained only about $8 million, or that the BLC II Fund was so

27  heavily—and increasingly—concentrated in Majestic.  In fact, Plaintiffs did not know

28  through 2015 and into the first half of 2016 about the BLC II Fund's

overconcentration in Majestic.  This level of concentration was both fraudulent and grossly negligent given that the investment funds were paid to diversify risk. Defendants breached their duties to Plaintiffs by concentrating so much of the BLC II Fund in a non-operating manufacturing facility that needed a major overhaul and signed a large management contract with Defendants, when the BLC II Fund was marketed to Plaintiffs and Blue Hall as a conservative fund with capital preservation as its primary objective.

43.    Throughout 2015 and the first half of 2016, Defendants assured Plaintiffs that the Majestic investment was succeeding, and that the sawmill was on track to be profitable, all of which was untrue and the untruth of which was then known to Defendants but never disclosed to Plaintiffs.  Defendants continued to value the Majestic investment at par, rather than marking it down, propping up that valuation by putting further money into Majestic, and concealing from Plaintiffs Majestic's underperformance.  Investor updates provided by Defendants in 2015 and the first half of 2016 also continued to describe the Majestic loan and the sawmill's anticipated performance as positive, despite Defendants knowing the opposite and/or having no reasonable basis for these claims.

44.    During a February 26, 2016 update call with Defendants, as confirmed by the notes taken by Blue Hall during that call, Defendants (i) focused on their plan to loan to specialty finance companies, not operating companies like Majestic, concealing the overconcentration of the BLC II Fund in Majestic, and misrepresenting the money that could reasonably be expected to remain in the BLC II Fund to make additional investments; (ii) described Majestic as healthy, despite knowing that the sawmill was still not open or operational; and (iii) mentioned that Bridge Lane Capital would be acquired by The Man Group, an $80 billion investment group, and falsely suggested that any capital or portfolio concentration concerns would be ameliorated by The Man Group's involvement.

COMPLAINT FOR DAMAGES

45.     In a March 2016 email from Lovy to Balbuena, Defendants again concealed Majestic's failures, Lovy "conservatively" estimated 5–6% income distributions for April–December 2016, and repayments of 20% in 2017, 40% in 2018, and 40% in 2019.  This estimate was consistent with Defendants' false narrative that, even though the Majestic plant's reopening was delayed, the combination of the BLC II Fund's debt, equity, and management fees would produce strong returns after the "teething issues" referred to in two quarterly update letters were fully resolved. The admission that the Majestic loan was in work-out with an expected, significant valuation drop at year-end was not disclosed to Plaintiffs and Blue Hall until an update call on November 3, 2016.  Defendants knew, on information and belief, on a much earlier date that the sawmill and its collateral were severely distressed, but breached their duties and further perpetrated their fraud by failing to timely disclose and instead concealing the same from Plaintiffs and Blue Hall.

46.     During a mid-May 2016 telephone call with Hoyt, Broesder assured Hoyt that while the opening of the Majestic sawmill was delayed, the impact of the delay would be minor compared to the cash flow that Majestic would generate once it reopened, and Broesder again assured Plaintiffs that Majestic was still a strong investment.  Since Hoyt was considering putting a close college friend in to the BLC II Fund, he repeatedly asked Broesder to confirm that the Majestic loan was delayed but not impaired.  Broesder repeatedly reassured Hoyt that the plant reopening delay was unfortunate, but Majestic was definitely not distressed.

47.     Despite the foregoing, upon being asked by Blue Hall about the fact that distributions had declined, Lovy represented in an October 21, 2016 email that Majestic "is now processing and selling products more regularly."  In fact, Majestic was continuing to fail.

48.     In the December 2016 BLC II Fund quarterly update, Defendants described Majestic's operational cash flow as break even and self-sustaining.

49.    In a March 2017 email from Lovy to Gropp, Defendants assured Blue Hall that Majestic's results "have been better than previous in terms of throughput and sales," suggesting that they would confirm the same in person.  In fact, Majestic was continuing to fail.  Defendants never offered a post-visit, accurate assessment of Majestic's inability to be profitable or the inability to realize any reasonable return upon the liquidation of the sawmill's assets.

50.    In fact, for the year 2015, Majestic's assets were valued at $5.3 million, whereas its total liabilities were $6.3 million.  Majestic's revenues for 2015 were only $376,000.00, and its cost of sales $423,000.00.  Expenses were $1.2 million, of which $564,000.00 was interest expense and $300,000.00 was management expense.  Net income was negative for 2015 by $1.2 million.  A subsequent valuation prepared by ValSpan Inc., on November 24, 2015, assessed the fair market value of Majestic's assets at only $3.3 million.  ValSpan noted:  "All parties agree that due to the start up nature of the subject facility no history of earnings exist."

51.    For the year 2016, Majestic's total revenues were $572,000.00, cost of sales was $1.1 million, and gross profit was -$513,000.00.  Net income was negative for 2016 by $1.6 million.  Total liabilities were now $8 million.  ValSpan conducted another valuation, and further dropped the fair market value of Majestic's assets to only $2.991 million.  Expenses for 2016 were $1.1 million, of which $251,000.00 was interest expense.  Further, as another fraudulent act by Defendants to conceal their misconduct, given Majestic was non-operational and thus not generating any income to pay interest expense, this interest was paid to Plaintiffs and other investors using other fund money and/or new investment money, creating the false appearance that Majestic was solvent.

52.    In March 2017, KPMG, BLC II Fund's independent auditor, recommended reducing Majestic's book value to be approximately $5 million, in significant part because there had been no additional investment in the project and operational difficulties had been identified.

COMPLAINT FOR DAMAGES

53.     In June 2017, Majestic suspended operations and laid off most of its employees.

54.     In first three quarters of 2017, the BLC II Fund's net return to investors was -69%, due to Majestic failing.  The BLC II Fund did not make any distributions to its investors in 2017.

55.     In the December 18, 2017 Investment Update for the BLC II Fund investors, Defendants suggested that Majestic would be liquidated, meaning that Plaintiffs will likely see pennies on the dollar for the millions that they invested in the BLC II Fund.  KPMG suggested a considerable, additional write down in Majestic's value, given it had little value but for liquidating its assets.

56.     Beyond the actionable misrepresentations and omissions described in the foregoing paragraphs, Defendants committed gross acts of professional negligence by investing the majority of the capital then raised in Majestic.  This overconcentration discouraged other investors from putting money in the BLC II Fund, thereby preventing diversification that would have hedged against the Majestic loss. Defendants did insufficient due diligence, largely basing the Majestic investment upon a single engineering report, which Defendants lacked the requisite expertise to properly assess and evaluate, and opted to not hire a consultant with meaningful experience in wood manufacturing assets, instead going it alone based upon an unreasonable expectation that they could oversee the reopening of the sawmill. Defendants lacked the requisite experience and knowledge to invest in a sawmill. Defendants, without any reasonable expectation of a large, additional capital raise, put the majority of Plaintiffs' money into a single investment, namely a bankrupt, non-operational sawmill (56% of the total amount invested by the BLC II Fund).  Notably, Defendants increased the level of BLC II Fund's concentration in Majestic, throwing good money after bad at the defunct sawmill.  For BLC II Fund, Majestic eventually grew from 50% of a five-loan portfolio, to 73% of a three-loan portfolio.  Defendants, on information and belief, invested Plaintiffs' money into this sawmill to rescue

earlier loans made on the investment advice of Defendants.  Defendants violated their own policies and procedures, investing in a manner that created too much risk. Defendants did little to properly evaluate the liquidation value of Majestic, in the event that the sawmill could not be returned to profitability, and did nothing else to obtain security on the loan.  Defendants invested the $8 million raised in the BLC II Fund in no more than five investments, the Majestic investment being by far the largest, without guarantee of any additional money to permit diversification and thereby reduce risk.  Finally, having been permitted three of the five members on Majestic's board, Defendants ultimately controlled Majestic, and Defendants separately had a contract with Majestic to provide management services.  As such, Defendants are responsible for the bad business decisions that Majestic continued to make, that ultimately led to its unprofitability and demise.

## FIRST CAUSE OF ACTION

### VIOLATION OF EXCHANGE ACT SECTION 10(b) AND RULE 10b-5

### (By Plaintiffs Against All Defendants)

57.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

58.     Defendants each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

59.     Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon any person.

60.     Defendants' fraudulent scheme included, among other things, employing fraudulent devices, fraudulent acts, untrue statements of material fact, and/or material omissions as described above.

61.     The aforementioned misrepresentations made by Defendants regarding the BLC II Fund were material because had Plaintiffs known their falsity they would not have invested in the BLC II Fund, and no reasonable investor would have so invested.

62.     Plaintiffs relied on Defendants' fraudulent scheme, fraudulent acts, untrue statements of material fact, and/or material omissions in investing in the BLC II Fund.

63.     As an actual and proximate cause of Defendants' false and misleading statements and omissions, and Plaintiffs' justifiable reliance thereon, Plaintiffs have been damaged in an amount to be determined at trial, plus interest as allowed by law.

### SECOND CAUSE OF ACTION

### VIOLATION OF CORPORATIONS CODE SECTION 25400

### (By Plaintiffs Against All Defendants)

64.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

65.     Defendants made various statements to Plaintiffs in order to induce Plaintiffs to invest in the BLC II Fund, each of which was false, or was misleading due to the omission of material facts.

66.     Defendants affected a series of transactions to facilitate Plaintiffs' investments in the BLC II Fund, in violation of California Corporations Code section 25400(b).

67.     As an actual and proximate cause of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial, plus interest as allowed by law.

///

///

68.     Defendants acted with malice, oppression, and fraud in committing the foregoing intentional acts, such that an award of punitive damages against them is warranted to deter and make an example of them.

### THIRD CAUSE OF ACTION

### COMMON LAW FRAUD

### (By Plaintiffs Against All Defendants)

69.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

70.     By the acts, transactions, and courses of conduct alleged herein, Defendants misrepresented material facts to Plaintiffs in connection with the promotion and facilitating of investments in the BLC II Fund, and concealed material facts from Plaintiffs in connection with their investments in the BLC II Fund.

71.     Defendants knew, both at the time the statements were made and subsequent to the statements being made, that the statements made to Plaintiffs were false and misleading.

72.     By making the false and misleading statements to Plaintiffs, Defendants intended to defraud Plaintiffs and induce their reliance on Defendants' statements in investing in the BLC II Fund.

73.     Plaintiffs' reliance on the misstatements of material fact made by Defendants was justified and reasonable.  Plaintiffs had no reason to contemporaneously know that the statements of Defendants were false and misleading, and Plaintiffs were entitled to rely on the statements made by Defendants, as Defendants represented themselves to be experienced market experts and/or advisors, who were familiar with and would administer the BLC II Fund.

74.     As an actual and proximate cause of Defendants' false and misleading statements and omissions, and Plaintiffs' justifiable reliance thereon, Plaintiffs invested in the BLC II Fund, and have been damaged in an amount to be determined at trial, plus interest as allowed by law.

75.     Defendants acted with malice, oppression, and fraud in committing the foregoing intentional acts, such that an award of punitive damages against each of them is warranted to deter and make examples of them.

**FOURTH CAUSE OF ACTION**

**COMMON LAW NEGLIGENT MISREPRESENTATIONS**

**(By Plaintiffs Against All Defendants)**

76.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

77.     By the acts, transactions, and courses of conduct alleged herein, Defendants misrepresented material past and present facts to Plaintiffs in connection with the solicitation, promoting, and facilitation of their investments in the BLC II Fund, and had no reasonable basis for believing these misstatements to be true.

78.     By making the false and misleading statements to Plaintiffs, Defendants intended to induce Plaintiffs' reliance on the statements when investing in the BLC II Fund.

79.     Plaintiffs' reliance on the misstatements of material fact made by Defendants was justified and reasonable.  Plaintiffs had no reason to then know that the statements of Defendants were false and misleading, and Plaintiffs were entitled to rely on the statements made by Defendants.

80.     As an actual and proximate cause of Defendants' false and misleading statements and omissions, and Plaintiffs' justifiable reliance thereon, Plaintiffs invested in the BLC II Fund, and given its nature, could not withdraw from the BLC II Fund and remain invested, and have been damaged in an amount to be determined at trial, plus interest as allowed by law.

///

///

///

///

21

COMPLAINT FOR DAMAGES

**FIFTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(By Plaintiffs Against All Defendants)**

81.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

82.     Defendants were fiduciaries to Plaintiffs, owing them the highest duties of loyalty and candor, to deal fairly and honestly with Plaintiffs, and to act in the utmost good faith and in the best interest of Plaintiffs.

83.     Defendants breached this duty by at least (1) encouraging investments in the BLC II Fund in order to save earlier investments for other clients of Defendants in Majestic, without regard for Plaintiffs and without any disclosures; (2) failing to inform Plaintiffs of and/or misrepresenting the amount of other money in the BLC II Fund, and thus the Fund's ability to diversify, both at the time of Plaintiffs' initial investments and subsequent thereto; (3) failing to inform Plaintiffs and/or misrepresenting the nature of the risk in the Majestic investment; (4) failing to inform Plaintiffs of and/or misrepresenting the operational status, potential, and success of the Majestic investment, and covering up Majestic's poor performance by keeping its value at par and paying out interest on the loan using additional investment money; (5) investing Plaintiffs' money outside of Defendants' own stated guidelines and policies; and (6) failing to oversee and operate the Majestic investment with due care.

84.     As a result of these breaches of fiduciary duty, Plaintiffs have incurred both realized and unrealized losses, and have been damaged in an amount to be determined at trial, plus interest as allowed by law.

///

///

///

///

///

COMPLAINT FOR DAMAGES

## SIXTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES

### (By Plaintiffs Against All Defendants)

85.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

86.     Defendants' misconduct, as alleged herein, constitutes unlawful, unfair, and/or fraudulent business practices in violation of Section 17200, *et seq.*, of the California Business and Professions Code.

87.     As a result of Defendants' unlawful and fraudulent business practices (violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.*), the value of Plaintiffs' investments has substantially declined, and they have incurred both realized and unrealized losses, and have been damaged in an amount to be determined at trial, plus interest as allowed by law.

## SEVENTH CAUSE OF ACTION

### PROFESSIONAL NEGLIGENCE

### (By Plaintiffs Against All Defendants)

88.     Plaintiffs re-allege paragraphs 1 through 56 above as if set forth fully herein.

89.     Defendants, through, without limitation, their agents Brian Broesder and Westin Lovy, owed to Plaintiffs a duty to use such skill, prudence, and diligence as other fund managers and investment advisers commonly possess and exercise.

90.     Defendants breached their duty of professional care to Plaintiffs by at least (1) encouraging investments in the BLC II Fund in order to save earlier investments for other clients of Defendants in Majestic, without regard for Plaintiffs and without any related disclosures; (2) failing to inform Plaintiffs of and/or misrepresenting the amount of other money in the BLC II Fund, and thus the Fund's ability to diversify, both at the time of Plaintiffs' initial investments and subsequent thereto; (3) failing to inform Plaintiffs and/or misrepresenting the nature of the risk in

23

the Majestic investment; (4) failing to inform Plaintiffs of and/or misrepresenting the operational status, potential, and success of the Majestic investment, and covering up Majestic's poor performance by keeping its value at par and paying out interest on the loan using additional investment money; (5) investing Plaintiffs' money outside of Defendants' own stated guidelines and policies; and (6) failing to oversee and operate the Majestic investment with due care.

91.    As a result of Defendants' professional negligence, the value of Plaintiffs' investments has substantially declined, and they have incurred both realized and unrealized losses, and have been damaged in an amount to be determined at trial, plus interest as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For judgment in favor of Plaintiffs and against Defendants;

2.    For an award of compensatory damages according to proof;

3.    For an award of punitive damages according to proof;

4.    For an award of prejudgment interest to the extent permitted by law;

5.    For an award of Plaintiffs' reasonable attorneys' fees, to the extent permitted by law;

6.    For an award of costs of suit incurred herein; and

7.    For such other and further relief as the Court deems just and proper.

DATED:  February 1, 2018          SKIERMONT DERBY LLP


By: _____
PAUL B. DERBY
HAJIR ARDEBILI
JOHN J. O'KANE IV

Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury of all issues so triable**.**

3

DATED:  February 1, 2018                    SKIERMONT DERBY LLP

4

5

6

By: _____

7

PAUL B. DERBY
HAJIR ARDEBILI

8

JOHN J. O'KANE IV

9

Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

COMPLAINT FOR DAMAGES